IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DINORAH MARRERO RIVERA,    )  CASE NO.  1:20-CV-01736-SL
    )
        Plaintiff,    )
    )
    )  JUDGE SARA LIOI
    vs.    )  UNITED STATES DISTRICT JUDGE
    )
COMMISSIONER OF SOCIAL    )  MAGISTRATE JUDGE
SECURITY,    )  JONATHAN D. GREENBERG
    )
        Defendant.    )  **REPORT & RECOMMENDATION**

Plaintiff, Dinorah Rivera ("Plaintiff" or "Rivera"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

In October 2017, Rivera filed an application for SSI, alleging a disability onset date of April 16, 2013[2] and claiming she was disabled due to mental health, post-traumatic stress disorder, psychosis, and

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.
[2] Under 20 C.F.R. § 416.335, SSI benefits are payable as of the month following the month of application. Therefore, the period at issue begins on October 17, 2017, the date of application, regardless of the alleged onset date.

1

carpal tunnel. (Transcript ("Tr.") 15, 64, 79.) The application was denied initially and upon reconsideration, and Rivera requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 15.)

On May 15, 2019, an ALJ held a hearing, during which Rivera, represented by counsel and assisted by a Spanish interpreter, and an impartial vocational expert ("VE") testified. (*Id.*) On July 2, 2019, the ALJ issued a written decision finding Rivera was not disabled. (*Id.* at 15-28.) The ALJ's decision became final on June 2, 2020, when the Appeals Council declined further review. (*Id.* at 1-8.)

On August 6, 2020, Rivera filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 18-20.) Rivera asserts the following assignments of error:

(1) The ALJ committed harmful error in that his RFC was not supported by substantial evidence.

(2) The ALJ committed harmful error in his determination regarding credibility as it was not supported by substantial evidence and violated Social Security Ruling 16-3p.

(3) The ALJ committed harmful error when he did not meet his burden at Step Five of the Sequential Evaluation as the evidence does not support an RFC to perform work at the light level of exertion.

(Doc. No. 18 at 1.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Rivera was born in June 1976 and was 42 years-old at the time of her administrative hearing (Tr. 15, 26), making her a "younger" person under Social Security regulations. 20 C.F.R. § 416.963(c). She has a limited education and is able to communicate in English. (Tr. 26.) She has no past relevant work. (*Id.*)

2

**B.      Medical Evidence[3]**

On July 1, 2013, Rivera saw Carmen Gomez at The Nord Center for a mental health assessment. (Tr. 232-41.)  Rivera admitted a history of past abuse and drug use and reported she cut her arms with a knife and had anxiety and panic attacks.  (*Id.* at 232.)  Gomez noted, "[L]anguage barrier can be an issue for her" but Rivera's significant other was helpful.  (*Id.* at 233.)  That May, Rivera received treatment at Mercy Hospital emergency room for a panic attack and cutting, although Rivera did not remember the medication she received.  (*Id.* at 234.)  On examination, Gomez found Rivera well-groomed with average eye contact, clear speech, logical thought process, severe depressed mood, full affect, cooperative behavior, moderate memory impairment, average intelligence, and good insight into issues.  (*Id.* at 240-41.)  Gomez diagnosed Rivera with post-traumatic stress disorder ("PTSD"), cannabis abuse, and alcohol abuse.  (*Id.* at 239.)

On July 30, 2013, Rivera saw Evelyn Rivera, Ph.D., for a consultative psychological evaluation. (*Id.* at 220-24.)  Dr. Rivera noted Rivera was accompanied by her boyfriend, the interview was conducted in Spanish, and Rivera had trouble remembering the dates of events in her life.  (*Id.* at 220.)  On examination, Dr. Rivera found Rivera had appropriate hygiene, her hands and arms trembled at times, she appeared nervous, she spoke quickly, and she appeared agitated.  (*Id.* at 222.)  Rivera could count by threes forward but could not subtract by sevens from 100.  (*Id.*)  Rivera could remember all three memory words immediately after they were presented and again with prompts from Dr. Rivera after ten minutes. (*Id.*)  Dr. Rivera determined Rivera appeared to be functioning at the average to below average intellectual level, and she appeared to have impulse control issues.  (*Id.*)  Rivera reported cooking and cleaning,

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  The Court notes Defendant's counsel failed to comply with the Court's Initial Order (Doc. No. 8) with respect to the "Facts" section of the brief and did not set forth a recitation of the relevant medical evidence in that portion of the brief.  Therefore, the Court further limits its discussion of the evidence to the medical evidence set forth in Plaintiff's brief.

although her niece helped her.  (*Id.*)  Dr. Rivera diagnosed Rivera with cannabis dependence, alcohol dependence, depressive disorder not otherwise specified, and anxiety disorder not otherwise specified. (*Id.* at 223.)  Dr. Rivera determined Rivera had a "fairly good attention span" and focused on Dr. Rivera's questions for the most part, although Rivera's depressed and anxious mood, marijuana use, and limited coping skills "may make it difficult for her to perform certain tasks" and respond to appropriately to supervisors, coworkers, and work pressures at this time.  (*Id.* at 224.)  Dr. Rivera opined Rivera's drug use would impact her ability to perform work responsibilities.  (*Id.*)

On September 19, 2017, treatment providers at Family Solutions of Ohio developed a treatment plan for Rivera.  (*Id.* at 261-277.)  Rivera's problems at that time consisted of anxiety, depressed mood, anger management, abuse/neglect, and mental health.  (*Id.* at 261.)  Under preferred intervention, treatment providers recommended Rivera have a calming period of at least 30 minutes in an isolated environment and that she be allowed to process her feelings and thoughts about an incident before treatment providers offered feedback.  (*Id.* at 266.)

On November 27, 2017, Rivera saw Brahmaiah Tandra, M.D., for a psychiatric evaluation.  (*Id.* at 278.)  Dr. Tandra noted Rivera knew "some English" and she was able to communicate with him.  (*Id.*) Rivera reported having depression and anxiety.  (*Id.*)  Rivera told Dr. Tandra when she was anxious, she was restless and irritable and struggled with concentration and sleep disturbances.  (*Id.*)  Rivera also reported hearing voices.  (*Id.*)  Rivera was not taking any psychotropic medication at the time.  (*Id.*)  On examination, Dr. Tandra found Rivera cooperative with fair eye contact, coherent speech, sad mood, tearful affect, and fair insight and judgment.  (*Id.* at 279.)  Dr. Tandra determined Rivera had problems with coping skills, impulsivity, problem solving skills, and stress management skills, and that Rivera had interpersonal conflicts and "effective instability with intense inappropriate anger."  (*Id.*)  Dr. Tandra diagnosed Rivera with major depressive disorder, recurrent, severe, with some psychotic features,

generalized anxiety disorder, PTSD, cannabis use disorder, mild, and borderline personality characteristics. (*Id.*)

On January 3, 2018, Rivera saw Eric Gaines, PA-C, at University Hospitals Center for Orthopedics for her bilateral knee pain. (*Id.* at 291-92.) Gaines noted Rivera had undergone a right knee ACL reconstruction in February 2016. (*Id.* at 291.) Rivera complained of bilateral knee pain since a fall about a year ago, and reported she had trouble weightbearing, especially on the right. (*Id.*) On examination, Gaines found the right knee neurovascularly intact, as well as intact sensation, limited range of motion, guarding, mildly positive Lachman's test, mild edema, tenderness to palpation diffusely, and crepitus with movement on the right. (*Id.* at 292.) Gaines found the left knee neurovascularly intact, as well as intact sensation, good range of motion, tenderness to palpation diffusely, no instability, and mildly positive McMurray's sign. (*Id.*) X-rays revealed advanced arthritis of the medial compartment of the right knee and minimal mild arthritis of the medial compartment of the left knee. (*Id.*) Gaines diagnosed Rivera with knee pain, bilateral primary osteoarthritis of the knees, possible retear of the right ACL, and possible meniscus tear of the left knee. (*Id.*) Gaines ordered bilateral knee MRIs. (*Id.*)

On March 14, 2018, Rivera saw William Stanfield, M.D., for follow up after her bilateral knee MRIs. (*Id.* at 355-56.) Rivera reported improvement of her right knee, although she had continued popping, clicking, grinding, and pain in her left knee. (*Id.* at 355.) On examination, Dr. Stanfield found good range of motion without instability and mild tenderness on the right, and tenderness in the medial joint space on the left. (*Id.*) Anterior and posterior drawer tests, as well as Lachman's test, were negative. (*Id.*) Dr. Stanfield reviewed the MRIs, which showed intact ACL with some arthritic changes and degeneration on the right and medial meniscus tear and mild degenerative joint disease on the left. (*Id.*) Dr. Stanfield diagnosed ACL tear on the left, knee sprain, and right knee arthritis. (*Id.* at 355-56.) Rivera

5

told Dr. Stanfield she wanted to undergo a left knee arthroscopy with partial medial meniscectomy.  (*Id.* at 366.)

On March 29, 2018, Rivera saw James Spindler, M.S., for a psychological consultative examination.  (*Id.* at 310-16.)  Dr. Spindler noted Rivera spoke very little English and a translator was used during the examination.  (*Id.* at 310.)  Rivera reported PTSD, depression, panic attacks, and physical impairments that prevented her from working.  (*Id.*)  Rivera told Dr. Spindler she sometimes thinks she hears children singing and she hears voices telling her to hurt herself.  (*Id.* at 312.)  Rivera also reported nightmares three times a week and daily flashbacks of abuse in her past.  (*Id.*)  Rivera told Dr. Spindler she usually received good performance ratings at work and she never had any major problems getting along with supervisors or coworkers.  (*Id.*)  Rivera reported she cannot use her hands properly because of carpal tunnel and with her leg pain she did not feel she could maintain work.  (*Id.*)  Dr. Spindler noted Rivera's gait appeared normal although Rivera said she could not walk or stand for very long without increasing leg pain.  (*Id.* at 313.)

On examination, Dr. Spindler found Rivera cooperative with normal speech and no apparent difficulty in staying focused during the examination.  (*Id.*)  Rivera provided concise, coherent, and relevant answers to Dr. Spindler's questions, and although she seemed mildly depressed, she maintained good eye contact.  (*Id.*)  Rivera reported poor energy, but she did not nap, and while she could go about in the community herself, she preferred to have another person with her.  (*Id.*)  Rivera recalled three of five objects after five minutes and accurately recited four digits forward and two backward.  (*Id.*)  Dr. Spindler determined Rivera appeared to function in the average range of intelligence.  (*Id.*)  Rivera reported shopping for food, clothing, and other items, and Dr. Spindler determined Rivera had an adequate level of knowledge for most aspects of daily living.  (*Id.* at 314.)  Rivera told Dr. Spindler she woke up at 10 a.m. on a typical day, smoked a cigarette, and showered.  (*Id.*)  Then she might wash dishes, vacuum, do a load

6

of laundry, and cook. (*Id.*) Her only hobbies consisted of watching movies and television. (*Id.*) Rivera reported having no friends, except family members. (*Id.*) Dr. Spindler diagnosed Rivera with PTSD, unspecified depressive disorder, unspecified anxiety disorder, alcohol use disorder, cannabis use disorder, and stimulant use disorder (cocaine), in sustained remission. (*Id.*)

Functionally, Dr. Spindler opined that Rivera seemed capable of understanding, remembering, and carrying out instructions in most job settings. (*Id.* at 315.) While Rivera had a "relatively poor showing on recalling objects and reciting digits," she did not appear to have concentration or attention problems during the interview. (*Id.*) Therefore, Dr. Spindler opined Rivera seemed to have the mental ability to sustain a working pace and a level of attention and concentration sufficient for most job settings. (*Id.*) Finally, Dr. Spindler opined Rivera seemed capable of responding appropriately to supervisors and coworkers, and she seemed able to respond appropriately to routine work pressures. (*Id.* at 316.)

Rivera underwent left knee arthroscopy and partial medical meniscectomy on April 12, 2018. (*Id.* at 357.) Six days later, Rivera saw PA-C Gaines for follow up. (*Id.*) Rivera reported a "good amount of pain" and trouble weightbearing, even though Rivera was weightbearing without crutches. (*Id.*) Rivera denied numbness, tingling, locking, or catching. (*Id.*) On examination, Gaines found intact sensation, range of motion of 95 degrees flexion to 5 degrees extension, mild to moderate edema of the left knee, mild ecchymosis over the medial port site, and negative Homan's sign. (*Id.* at 357-58.) Gaines directed Rivera to continue weightbearing as tolerated and to begin outpatient physical therapy. (*Id.* at 358.)

On May 9, 2018, Rivera saw Gaines for follow up. (*Id.* at 359.) Rivera reported bilateral knee pain, worse on the left than the right, and weakness. (*Id.*) Gaines noted Rivera had not yet started physical therapy. (*Id.*) On examination, Gaines found intact sensation, range of motion from 0 to 105 degrees, and mild edema of the left knee, with "extreme weakness over the quads" on the left but no instability of the left knee. (*Id.* at 359-60.) On the right, Gaines found intact sensation, good range of

7

motion, mild tenderness, good strength, and no instability or edema.  (*Id.* at 360.)  Gaines emphasized the importance of Rivera beginning physical therapy.  (*Id.*)

That same day, Rivera saw Rachael Orasko, PT, for her first physical therapy session.  (*Id.* at 395.) Orasko noted Rivera demonstrated reduced left knee range of motion and strength because of pain.  (*Id.*) Rivera walked with a mildly antalgic gait with decreased left knee flexion and extension.  (*Id.*)  Orasko described Rivera's prognosis as good.  (*Id.* at 396.)  Orasko noted Rivera used no assistive device and needed no assistance walking.  (*Id.* at 397-98.)  On examination, Orasko found full range of motion and strength of the right lower extremity except for hip abduction and extension at 4/5, and on the left, 4+/5 hip flexion, 3-/5 knee extension,4+/5 knee flexion, 5/5 dorsiflexion, 4-5 hip abduction, and 3+/5 hip extension.  (*Id.* at 398.)

On May 17, 2018, Rivera saw Nicole Gipson, PTA, for her second physical therapy visit.  (*Id.* at 402.)  Rivera complained of knee pain that she rated a 7/10.  (*Id.*)  Rivera's case worker accompanied her to this visit.  (*Id.*)  Gipson noted poor home exercise program compliance.  (*Id.*)

On May 30, 2018, Rivera saw Anthony Lusher, PTA, for her third physical therapy visit.  (*Id.* at 406.)  Rivera's case worker again accompanied her.  (*Id.*)  Rivera reported receiving topical cream for pain, which she said did not help.  (*Id.*)  Rivera told Lusher she had been compliant with her home exercise program, although she complained of pain with heel slides.  (*Id.*)  On examination, Lusher noted improved tolerance with one exercise and that while Rivera reported 10/10 pain after therapy, her body language was inconsistent with a high pain level.  (*Id.* at 407.)

On June 5, 2018, Rivera saw John Beckwith, PTA, for her fourth physical therapy session.  (*Id.* at 410.)  Rivera's case worker again accompanied her.  (*Id.*)  Rivera reported increased pain since her last session.  (*Id.*)  On examination, Beckwith found "[g]ood tolerance to progressions and treatment."  (*Id.* at 411.)

On July 11, 2018, Rivera saw Dr. Stanfield for follow up.  (*Id.* at 361.)  Rivera complained of continued problems with her left knee, as well as a painful lump on her left knee.  (*Id.*)  Rivera reported some swelling and discomfort in her left knee, and occasional popping and clicking, but no locking, catching, or giving way.  (*Id.*)  Rivera told Dr. Stanfield she had stopped physical therapy because of pain.  (*Id.*)  On examination, Dr. Stanfield found crepitus with range of motion, negative anterior and posterior drawer tests, negative Lachman's test, negative pivot shift, and well-healed portals.  (*Id.* at 362.)  Dr. Stanfield administered a cortisone injection and Rivera was to start back on her exercise program and ibuprofen.  (*Id.*)

On July 31, 2018, Dale Luchetti, PT, discharged Rivera from physical therapy.  (*Id.* at 414-15.)  Rivera had cancelled two appointments and failed to show for two appointments.  (*Id.* at 414.)  Luchetti noted Rivera had requested a hold after her fourth visit and did not return to therapy.  (*Id.*)

On August 29, 2018, Rivera saw PA-C Gaines for follow up and reported the cortisone injection had helped with her pain and her swelling.  (*Id.* at 363.)  While Rivera reported her symptoms were beginning to return, she reported only mild pain, stiffness, and swelling of her left knee.  (*Id.*)  Rivera also complained of secondary low back and left hip pain with weightbearing.  (*Id.*)  Rivera denied locking, catching, and giving away.  (*Id.*)  On examination, Gaines found intact sensation, improved range of motion, improved mild edema, minimal tenderness to palpation, mild crepitus, no instability, and mild weakness on the left.  (*Id.* at 364.)  Gaines noted Rivera would continue with her home exercise program and prescribed a Medrol Dosepak.  (*Id.*)

On September 25, 2018, Rivera saw Dr. Stanfield for follow up.  (*Id.* at 365-66.)  Rivera reported her left knee felt the same.  (*Id.* at 365.)  Rivera complained that nothing seemed to be helping her swelling, stiffness, and pain in her left knee.  (*Id.*)  While activity exacerbated her symptoms, rest alleviated them.  (*Id.*)  Rivera reported the pain sometimes got severe and she had been icing and elevating

her knee for the swelling.  (*Id.*)  On examination, Dr. Stanfield found tenderness, crepitus with range of motion, negative anterior and posterior drawer tests, and range of motion of 0 to 105 degrees.  (*Id.* at 366.)  X-rays of the left knee revealed moderate arthritis with joint space narrowing and marginal osteophyte.  (*Id.*)  Dr. Stanfield diagnosed Rivera with chronic knee pain due to primary arthritis.  (*Id.*)   Rivera wanted to proceed with viscosupplementation.  (*Id.*)  Dr. Stanfield wrote:

> In conclusion, this patient has O.A. of the knee which is symptomatic causing significant morning stiffness lasting up to an hour with popping, clicking, grinding with ROM which is worse with prolonged standing or going up/down stairs.  This affects functional activities and ADL's.  There is radiographic evidence of O.A. with joint space narrowing and marginal osteophyte formation.  This patient has also failed nonpharmacologic treatment for O.A. including attempts at weight loss, home exercise program.  The patient has also failed pharmacologic treatment for O.A. including OTC analgesics, anti-inflammatory medications as well as intra-articular corticosteroid injections.  For these reasons, I feel, the patient is a candidate for Viscosupplementation injections of the left knee.

(*Id.*)

Rivera underwent Viscosupplementation injections in her left knee in October and November 2018.  (*Id.* at 367, 369, 416.)

**C.      State Agency Reports**

**1.  Mental Impairments**

On April 2, 2018, Patricia Kirwin, Ph.D., opined Rivera had mild limitations in her abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  (*Id.* at 70.)  Dr. Kirwin found no severe psychiatric impairments.  (*Id.*)

On July 23, 2018, on reconsideration, Paul Tangeman, Ph.D., affirmed Dr. Kirwin's findings.  (*Id.* at 84-85.)

### 2.  Physical Impairments

On January 22, 2018, William Bolz, M.D., opined Rivera could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 72-74.)  Dr. Bolz further opined Rivera's ability push and/or pull was unlimited, other than shown for lift and/or carry.  (*Id.* at 73.)  Rivera could frequently climb ramps/stairs, but she could never climb ladders, ropes, or scaffolds.  (*Id.*)  She could occasionally kneel, crouch, and crawl.  (*Id.*)  Rivera's abilities to balance and stoop were unlimited.  (*Id.*)  Dr. Bolz found no manipulative limitations.  (*Id.*)

On July 25, 2018, on reconsideration, Venkatchala Sreenivas, M.D., opined Rivera could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds, stand and/or walk for four hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 86-88.)  Dr. Sreenivas limited Rivera's ability to push and/or pull with the right lower extremity to occasional.  (*Id.* at 87.)  Rivera could occasionally climb ramps/stairs, but she could never climb ladders, ropes, or scaffolds.  (*Id.*)  She could occasionally kneel, crouch, and crawl.  (*Id.*)  Rivera could frequently balance, and her ability to stoop was unlimited.  (*Id.*)  Dr. Sreenivas found no manipulative limitations.  (*Id.*)  Rivera must avoid all exposure to hazards.  (*Id.* at 88.)  Dr. Sreenivas noted the additional exertional, postural, and environmental limitations were added because of Rivera's advanced osteoarthritis in her right knee.  (*Id.*)

### D.  Hearing Testimony

During the May 15, 2019 hearing, Rivera testified to the following:

- She spoke a little bit of English.  (*Id.* at 52.)  She understood English but did not like to speak it too much.  (*Id.*)

- Her knee still bothers her.  (*Id.* at 53.)  She wears a knee brace, and she cannot sit for too long.  (*Id.*)  Sometimes she cannot stand for very long.  (*Id.*)  She stood during the hearing because the brace she had on bothered her.  (*Id.* at 54.)

- She has problems with her hands.  (*Id.* at 55.)  She cannot cut or chop things because sometimes her hands go numb.  (*Id.*)  Her hands stiffen and then the pain goes all the way to her shoulders.  (*Id.*)  Her pain starts quickly using her hands.  (*Id.*)  Within five minutes her hands go numb.  (*Id.*)  If she stands for too long, the same thing happens with her legs and her knee.  (*Id.*)

- She cannot be around a crowd of people or too many people.  (*Id.* at 56.)  She feels like they are going to do something to her, and she feels nervous.  (*Id.*)  She has to go to the supermarket in the morning when there aren't that many people.  (*Id.* at 57.)  She struggles to focus and concentrate.  (*Id.*)  She will go to cook something, and then she will stand in front of the stove and think of what it was she was going to do.  (*Id.*)  She doesn't finish things she starts.  (*Id.* at 58.)

The ALJ posed the following hypothetical question:

> [A]ssume a hypothetical person Claimant's age, education and work experience. This person is limited to lifting and carrying up to 20 pounds occasionally, ten pounds frequently, standing and walking up to four hours in an eight-hour workday, occasional pushing and pulling with the lower extremities, no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs, frequent balancing but only occasional kneeling, crouching and crawling.  This person should avoid all exposure to unprotected heights and the use of heavy machinery. This person further should be limited to performing simple tasks and following simple instructions with the general public as well as coworkers and supervisors. Could that individual be able to perform any jobs in the national economy?

(Tr. 58-59.)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as garment sorter, shipping and receiving weigher, and folder.  (*Id.* at 59-60.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.

12

20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since October 17, 2017, the application date (20 CFR 416.97 *et seq.*).

2. The claimant has the following severe impairments: bilateral knee disorder, post-traumatic stress disorder (PTSD), unspecified depressive disorder, and unspecified anxiety disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she is limited to lifting and carrying up to 20 pounds occasionally and 10 pounds frequently and standing and walking up to four hours in an eight-hour workday. She is limited to occasional pushing and pulling with the lower extremities. She is limited to no climbing ladders, ropes, or scaffolds, occasional climbing ramps and stairs, frequent balancing, but only occasional kneeling, crouching, and crawling. She should avoid all exposure to unprotected

13

heights and the use of heavy machinery. She is limited to performing simple tasks and following simple instructions, few, if any, workplace changes, and only occasional interaction with the general public as well as coworkers and supervisors.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on June **, 1976, and was 41 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since October 17, 2017, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-27.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

14

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

15

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  First Assignment of Error

In her first assignment of error, Rivera asserts the ALJ's RFC finding lacked substantial evidence. (Doc. No. 18 at 8.)  Under this broad assertion, Rivera raises several arguments regarding the ALJ's decision: (1) the ALJ erred at Step Three in finding Rivera only had moderate limitations in the "B" criteria under Listings 12.04, 12.06, and 12.15; (2) the ALJ erred at Step Three in finding Rivera did not meet Listing 1.02; and (3) the ALJ failed to evaluate the medical opinions in the record in accordance with the regulations.  (*Id.* at 8-16.)

The Commissioner responds that the ALJ properly found Rivera did not meet the requirements of a Listing and was capable of performing a range of light work.  (Doc. No. 19 at 5.)

#### 1.  Step Three

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

16

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. Appx. 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *Id.* at 416-17. *See also Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 F. App'x at 416; *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 311 (6th Cir. July 13, 2018) (same)). *See also Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge

17

between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 5:12CV1818, 2013 WL 4710516, at *10 (N.D. Ohio Aug. 29, 2013)).

At Step Two, the ALJ found that Rivera's bilateral knee disorder, PTSD, unspecified depressive disorder, and unspecified anxiety disorder constituted severe impairments.  (Tr. 17.)  At Step Three, the ALJ expressly stated that he considered Listings 1.02, 12.04, 12.06, and 12.15 and addressed the criteria for those listings as follows:

> The severity of the claimant's impairments, considered singly and in combination, do not meet or medically equal the criteria of any impairment listed in Appendix 1 of the Regulations (20 CFR, Subpart A, Appendix 1).  In particular, the undersigned considered listings 1.02, Major dysfunction of a joint(s), 12.04, Depressive, bipolar and related disorders, 12.06, Anxiety and obsessive-compulsive disorders, and 12.15, Trauma-and stressor-related disorders.
>
> Listing 1.02, Major dysfunction of joint, is unsatisfied because the record does not show the claimant has a gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  This must also include involvement of one major peripheral weight-bearing joint, resulting in an inability to ambulate effectively or perform fine and gross movements effectively, or involvement of one major peripheral joint in each upper extremity resulting in an inability to perform fine and gross movements effectively.  The claimant ambulated with a mildly antalgic gait or otherwise normal gait and required no assistive device (Ex. 6F/5, 11F/7, 9-11).  She reported to engage in activities, such as washing dishes, vacuuming, laundry, cooking, and managing personal grooming and hygiene (Ex. 6F/6).  Therefore, the undersigned finds listing 1.02 is unsatisfied.
>
> The claimant's representative contended the claimant meets a mental listing (Hearing Record).  The undersigned rejects this contention and notes the representative did not provide specifics regarding this argument.  The undersigned finds the severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering, or applying information, the claimant has a moderate limitation. The claimant moved from Puerto Rico from [sic] the United States in 1993 (Ex. 6F/3). She dropped out of high school in the 11th grade and did not earn her GED but was enrolled in a general course of study and generally earned B's and C's. She also obtained a driver's license, although [sic] has been subsequently suspended for failure to show up for a court hearing. An evaluation from November 2017 indicated the claimant knows some English and is able to communicate (Ex. 3F/23). A psychological consultative examiner estimated the claimant's functioning in the average range of intelligence (Ex. 6F/5, 7). She exhibited clear speech and provided concise, coherent, and relevant answers to questions (Ex. 6F/5). She also recalled three of five objects after five minutes, accurately recited four digits forward and two digits backward, and knew correct change but did not know the current president of the U.S. The claimant manages her activities of daily living independently (Ex. 6F/6). Thus, the undersigned finds the claimant's mental impairments cause no more than moderate limitation in her ability to learn, recall, and use information.

In interacting with others, the claimant has a moderate limitation. The record referenced issues with anxiety and interpersonal conflicts at time [sic]. Still, she lives with her boyfriend and brother (Ex. 6F/3, 11F/9). She reported having no friends other than family members and reported no major problems getting along with supervisors or coworkers at past employment (Ex. 6F/4, 6). Examiners described the claimant as cooperative (Ex. 3F/24, 6F/5, 7F/13, 8F/27). Therefore, the undersigned finds the claimant has no more than moderate limitation in her ability to interact with others independently, appropriately, effectively, and on a sustained basis.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The record referenced some difficulty with concentration when anxious (Ex. 3F/23, 7F/12). However, the claimant showed no apparent difficulty staying focused during a psychological consultative evaluation in March 2018 (Ex. 6F/5). The claimant performed mental status tasks and described daily activities, such as shopping for food, clothing, and other items, using a debit card, performing chores, laundry, and cooking (Ex. 6F/5-6). She also reported to watch movies and television (Ex. 6F/6). The claimant presented on examination as alert and oriented (Ex. 6F/5, 11F/11). Accordingly, the undersigned finds the claimant has no more than moderate limitation in her ability to focus attention and stay on task at a sustained rate.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant presented as appropriately dressed with average grooming habits (Ex. 6F/5). She described often feeling anxious and varying levels of depression daily, some moodiness, and occasional short-temperedness but no extreme or unexplained mood swings (Ex. 6F/5-6). She can calm herself down from instances of worry and a sense of panic and showed reliable judgment. The claimant also manages her personal needs daily and performs household tasks, such as washing dishes, vacuuming, laundry, and cooking (Ex. 6F/6).

Therefore, the undersigned finds the claimant has no more than moderate limitation in her ability to regulate emotions, control behavior, and maintain well-being.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. She manages her own personal needs and is able to leave the house independently if necessary (Hearing Record, Ex. 6F/5-6).

(Tr. 18-20.)

In his RFC analysis, the ALJ further found as follows:

As such, the objective evidence failed to support the degree of alleged limitations. The claimant received limited, sporadic, and conservative treatment (Ex. 2F, 3F/6, 25, 29, 4F/7, 5F/2-4, 7F/2- 20, 8F/14-31, 9F/6, 11F/8, 26-27, 12F/1). The record included no evidence of inpatient hospitalizations, repeated emergency department visits, ongoing use of an assistive device, or failed courses of treatment. In particular, despite the claimant's bilateral knee condition, the record included no evidence of treatment in 2019 and limited treatment in 2018 following her surgery. The claimant attended only about four of the eight to 10 prescribed physical therapy sessions and received Viscosupplemenation injections without complication (Ex. 8F/28-31, 11F/8-9, 26-27, 12F/1). The record included no evidence of psychiatric treatment after May 2018.

In addition, examinations demonstrated some limitations due to her bilateral knee condition but functioning otherwise remained within normal limits (Ex. 4F/7-8, 8F/14-15, 20-21, 23, 25, 27). She also presented as oriented and cooperative with fair eye contact, normal speech, generally normal thought content and processes, and fair insight and judgment (Ex. 3F/24, 7F/15, 19). The claimant reported improvement with her medication regimen (Ex. 7F/15, 17, 19). Moreover, the claimant has continued to engage in activities, such as managing her personal grooming and hygiene, and performing household tasks, such as washing dishes, vacuuming, laundry, and cooking (Hearing Record, 6F/6).

Therefore, the light exertional level, including lower extremity push/pull and postural and environmental limitations account for the claimant's bilateral knee condition. The mental residual functional capacity to perform simple tasks, follow simple instructions, and few, if any, workplace changes account for moderate limitation in understanding, remembering, and applying information, concentrating, persisting, and maintaining pace, and adapting or managing oneself due to some difficulty with anxious and sad mood, irritability, restlessness, and difficulty with concentration when anxious. Occasional interaction with the

20

general public as well as coworkers and supervisors account for moderate limitation in interacting with others due to the claimant's anxious and depressed mood and some difficulty being around others and in crowds. Accordingly, the undersigned finds the record does not establish limitations that would preclude work activity within the residual functional capacity defined in this decision.

(Tr. 23-24.)

### a. Listing 1.02

Listing 1.02 is defined as follows:

> **1.02 *Major dysfunction of a joint(s) (due to any cause)***: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

The "inability to ambulate effectively" is defined as follows:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2b(1). The regulations provide further guidance regarding effective ambulation, as follows:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches, or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's

home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2b(2).

Substantial evidence supports the ALJ's conclusion that Rivera does not meet the requirements of Listings 1.02. First, Rivera's argument regarding Listing 1.02 is not well-taken, as she failed to raise this argument at the hearing before the ALJ. Rivera does not argue there is any evidence the ALJ ignored or overlooked. (Doc. No. 18 at 10-12.)[4] Indeed, it is clear from a review of the decision that the ALJ considered the testimonial, medical, and opinion evidence regarding Rivera's impairments, including the evidence on which Rivera relies in arguing she meets or equals a listing. (Tr. 21-25.) The ALJ acknowledged Rivera's testimony that she cannot be on her feet for long periods of time and had difficulty going up and down steps. (*Id.* at 21.) However, as the ALJ found, the evidence regarding Rivera's knee disorder was mixed. (*Id.* at 18-24.) As of July 25, 2018, the state agency reviewing physician considered the applicability of the listings, including Listing 1.02, and did not find any listing to be met or equaled. (*Id.* at 85-88.) Rivera does not challenge the ALJ's determination regarding Dr. Sreevinas' opinion on reconsideration. (Doc. No. 18 at 14-16.) It is the ALJ who "'has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record.'" *Elliott v. Comm'r of Soc. Sec.*, No. 5:17 CV 2140, 2019 WL 400537, at *12 (N.D. Ohio Jan. 31, 2019) (citing *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004)) (additional citation omitted). It is not for this Court to reweigh the evidence on judicial review.

Even if there is evidence that supports Rivera's argument, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90. Rather, as noted above, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference

---

[4] Rivera instead argues the ALJ "relied on the observations during the psychological consultative examination but disregarded the findings from her physical examinations." (Doc. No. 18 at 11.)

from the courts." *Felisky*, 35 F.3d at 1035.  "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility."  *Postell v. Comm'r of Soc. Sec.*, No. 16-13645, 2018 WL 1477128, at *10 (E.D. Mich. Mar. 1, 2018), *report and recommendation adopted by* 2018 WL 1471445 (E.D. Mich. Mar. 26, 2018).  Here, the ALJ's Step Three findings that Rivera did not meet or equal the requirements of Listing 1.02 is within that "zone of choice" and thus supported by substantial evidence.

### b.  Listings 12.04, 12.06, and 12.15

Listings 12.04, 12.06, and 12.15 contain the following criteria: (i) "paragraph A" criteria, impairment-related symptoms, (ii) "paragraph B" criteria, impairment-related limitations, and (iii) "paragraph C" criteria, additional functional criteria.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00A, 12.04, 12.06, 12.15.  A claimant can meet the requirements of this Listing only if she satisfies either: (1) the criteria of both paragraphs A and B; or (2) the criteria of paragraph C.  *See Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 372 (6th Cir. 2017).  Rivera focuses her arguments on the "paragraph B" criteria. (Doc. No. 18 at 9-10.)

In order to satisfy the "paragraph B" criteria of Listings 12.04, 12.06, and 12.15, Rivera must exhibit "marked" or "extreme" functional limitations in two or more of the following categories: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00A(2)(b), 12.04, 12.06, 12.15.  To establish a "marked" limitation in any of these areas, a claimant's functioning "independently, appropriately, effectively, and on a sustained basis" must be seriously limited.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F(2)(d).  To establish an extreme limitation in any of these areas, a claimant must not be able to function in this area "independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F(2)(e)

23

The Court finds substantial evidence supports the ALJ's determination that Rivera did not meet or equal Listings 12.04, 12.06, and 12.15.[5]  The ALJ thoroughly discussed the record evidence regarding Rivera's mental impairments at Step Three and in his RFC analysis.  As the ALJ's decision and this Court's review of the record makes clear, Rivera's mental health treatment records were limited, and the medical findings within the treatment records are mixed.  The ALJ highlighted the mixed findings in the record, including those supporting a finding of disability.  (Tr. 21-26.)  While Rivera asserts that the testing Dr. Spindler performed did not support Dr. Spindler's conclusion that Rivera seemed capable of understanding, remembering, and carrying out instructions, Rivera overlooks that Dr. Spindler explained that, notwithstanding her deficiencies in object recall, Rivera did not appear to have any problems with attention or concentration during the evaluation.  (*Id.* at 315.)  While Rivera asserts the ALJ "disregarded" the evidence from the consultative examinations of Dr. Rivera and Dr. Tandra, the ALJ did no such thing; he discussed those reports in his decision at Step Three and in his RFC analysis.  The ALJ simply did not credit the findings from those reports the way Rivera would like.  But that is not grounds for reversal.  The ALJ provided a thorough, reasoned explanation throughout the decision as to how he weighed the evidence and resolved any conflicts.  (*Id.* at 21-26.)  Furthermore, the state agency reviewing psychologists, who had the benefit of reviewing the reports by Drs. Rivera, Spindler, and Tandra, opined that Rivera did not meet or equal a listing.  (*Id.* at 65-71, 80-85.)

Again, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts."  *Felisky*, 35 F.3d at 1035.  "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility."  *Postell v. Comm'r of Soc. Sec.*, No. 16-13645, 2018 WL 1477128, at *10 (E.D. Mich. Mar. 1, 2018), *report and recommendation adopted by* 2018 WL 1471445 (E.D. Mich. Mar. 26, 2018).  Here, the ALJ's Step Three

---

[5] Because the ALJ found Rivera did not meet the requirements of either Paragraphs B or C, the decision did not address the Paragraph A criteria of Listings 12.04, 12.06, and 12.15.

findings that Rivera did not meet or equal the requirements of Listings 12.04, 12.06, and 12.15 is within that "zone of choice" and thus supported by substantial evidence.

Therefore, the undersigned recommends the Court affirm the ALJ's findings at Step Three.

### 2.  Opinion Evidence

Rivera asserts the ALJ failed to evaluate the medical opinions in accordance with the regulations. (Doc. No. 18 at 13.)  Rivera argues the ALJ erred in finding Dr. Spindler's opinion "generally persuasive" when Dr. Spindler's finding that Rivera seemed capable of understanding, remembering, and carrying out instructions was not supported by Dr. Spindler's own testing on examination.  (*Id.* at 14.)  Rivera further argues that the ALJ erred in finding Dr. Rivera's opinion unpersuasive as the "only contrary evidence in this matter was the consultative examination by Dr. Spindler where the findings, as set forth above, were not consistent with the examination."  (*Id.* at 14-15.)

While the Commissioner discussed the opinions of Dr. Spindler and Dr. Rivera in support of the ALJ's RFC finding, the Commissioner did not respond to Rivera's argument that the ALJ failed to evaluate these opinions in accordance with the regulations.  (Doc. No. 19.)

Since Rivera's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the

factors set forth in the regulations: (1) supportability;[6] (2) consistency;[7] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to,

---

[6] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

[7] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1); 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ found as follows regarding Dr. Spindler's and Dr. Rivera's opinions:

James N. Spindler, MS conducted a psychological consultative evaluation on March 29, 2018 (Ex. 6F). Mr. Spindler opined the claimant seems capable of understanding, remembering and carrying out instructions in most job settings and seems likely to have the mental ability to sustain a working pace and to maintain a level of attention and concentration that would be sufficient for most job settings. In addition, she seems capable of responding appropriately to supervisor and to coworkers and seems capable of responding appropriately to routine work pressures (Ex. 6F/7-8). He further opined the claimant appears to have the mental ability to manage her funds if granted benefits. The undersigned finds this opinion is generally persuasive because it is consistent with the thorough evaluation that indicated the claimant presented as alert, oriented, cooperative, appropriately dressed with average grooming, and maintained eye contact, clear speech, provided concise, coherent, and relevant answers, showed no difficulty staying focused, and estimated average intelligence (Ex. 6F/5-7). The undersigned also finds this opinion is supported by other examinations that indicated euthymic mood, no hallucinative behaviors, and fair, improving insight and judgment (Ex.

7F/15, 17, 19). However, the undersigned finds this opinion is somewhat vague and does not provide specific functional abilities.

The undersigned also notes an opinion provided by Evelyn Rivera, Ph.D. based on a psychological consultative evaluation conducted on July 30, 2013 (Ex. 1F). Dr. Rivera opined the claimant may have difficulty carrying out instructions at this time, may have difficulty performing certain tasks at this time, and may have difficulty responding appropriately to supervisors/co-workers and work pressures at this time (Ex. 1F/6). However, the undersigned notes Dr. Rivera provided this opinion well before the claimant's 2017 application date in this case (Ex. 1D). The undersigned also finds this opinion is inconsistent with the record that demonstrated stability and improvement when receiving treatment (Ex. 2F/12, 3F/6, 7F/2, 12, 15, 19, 9F/6). In addition, the undersigned finds this opinion is inconsistent with examinations that indicated euthymic mood, normal speech, and fair insight and judgment as well as her ability to manage her personal needs and perform household tasks (Ex. 3F/24, 6F/6, 7F/15, 17). Therefore, the undersigned finds Dr. Rivera's opinion is unpersuasive.

(Tr. 25-26.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. § 416.920c(a). With respect to Dr. Spindler's opinion, the ALJ found Dr. Spindler's opinion consistent with, and supported by, medical evidence in the record, citing specific evidence in support. (Tr. 25.) While Rivera asserts that the testing Dr. Spindler performed did not support Dr. Spindler's conclusion that Rivera seemed capable of understanding, remembering, and carrying out instructions, Rivera overlooks that Dr. Spindler explained that, notwithstanding her deficiencies in object recall, Rivera did not appear to have any problems with attention or concentration during the evaluation. (*Id.* at 315.) With respect to Dr. Rivera's opinion, the ALJ found her opinion inconsistent with, and not supported by, medical evidence in the record, citing specific evidence in support. (*Id.* at 25-26.) While Rivera reads the record as supporting her conclusion that the "only contrary evidence in this matter was the consultative examination by Dr. Spindler where the findings . . . were not consistent with the examination," the ALJ interpreted the record differently and cited to other findings in the record to support his determination that Dr. Rivera's opinion was not persuasive. (*Id.*)

28

It is the ALJ's job to weight the evidence and resolve conflicts, and he did so here.  While Rivera would weigh the evidence differently, it is not for the Court to do so on appeal.

Therefore, the undersigned recommends the Court find no error in the ALJ's evaluation of the opinion evidence in this case.

## B.     Second Assignment of Error

In her second assignment of error, Rivera argues that the ALJ's credibility assessment lacks the support of substantial evidence for the following reasons: (1) the ALJ failed to consider her inability to communicate in English in the RFC and failed to mention it in the credibility assessment; (2) the ALJ failed to find she was unable to be around other people; (3) the ALJ failed to consider Rivera's disabling pain and the fact that it would interfere with her ability to maintain concentration and attention, as well as her ability to stand and walk; and (4) the ALJ cherry-picked the evidence to support his conclusion that she was not disabled.  (Doc. No. 18 at 18-19.)

The Commissioner responds that the ALJ properly evaluated Rivera's subjective complaints. (Doc. No. 19 at 10.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). *See also* SSR 16-3p,[8] 2016 WL 1119029 (March 16, 2016).

---

[8] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the May 15, 2019 hearing.

If these claims are not substantiated by the medical record, the ALJ must make a credibility[9] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[10] The ALJ need not analyze all seven factors but should show that he considered the relevant

---

[9] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 n.1 (6th Cir. 2016).

[10] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and

evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Rivera's testimony and other statements regarding her symptoms and limitations.  (Tr. 21.)  The ALJ determined Rivera's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.*)  However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision.  (*Id.*)  Specifically, the ALJ found:

- The record included "minimal and sporadic" mental health treatment.

- An evaluation from November 2017 showed Rivera knew some English and was able to communicate.

- Treatment notes showed "some improvement" with medication.

(*Id.* at 23.)

After reviewing the record evidence, the ALJ determined:

> As such, the objective evidence failed to support the degree of alleged limitations. The claimant received limited, sporadic, and conservative treatment (Ex. 2F, 3F/6, 25, 29, 4F/7, 5F/2-4, 7F/2- 20, 8F/14-31, 9F/6, 11F/8, 26-27, 12F/1). The record included no evidence of inpatient hospitalizations, repeated emergency department visits, ongoing use of an assistive device, or failed courses of treatment. In particular, despite the claimant's bilateral knee condition, the record included no evidence of treatment in 2019 and limited treatment in 2018 following her surgery. The claimant attended only about four of the eight to 10 prescribed physical therapy sessions and received Viscosupplemenation injections without complication (Ex. 8F/28-31, 11F/8-9, 26-27, 12F/1). The record included no evidence of psychiatric treatment after May 2018.

> In addition, examinations demonstrated some limitations due to her bilateral knee condition but functioning otherwise remained within normal limits (Ex. 4F/7-8, 8F/14-15, 20-21, 23, 25, 27). She also presented as oriented and cooperative with

---

restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

fair eye contact, normal speech, generally normal thought content and processes, and fair insight and judgment (Ex. 3F/24, 7F/15, 19). The claimant reported improvement with her medication regimen (Ex. 7F/15, 17, 19). Moreover, the claimant has continued to engage in activities, such as managing her personal grooming and hygiene, and performing household tasks, such as washing dishes, vacuuming, laundry, and cooking (Hearing Record, 6F/6).

Therefore, the light exertional level, including lower extremity push/pull and postural and environmental limitations account for the claimant's bilateral knee condition. The mental residual functional capacity to perform simple tasks, follow simple instructions, and few, if any, workplace changes account for moderate limitation in understanding, remembering, and applying information, concentrating, persisting, and maintaining pace, and adapting or managing oneself due to some difficulty with anxious and sad mood, irritability, restlessness, and difficulty with concentration when anxious. Occasional interaction with the general public as well as coworkers and supervisors account for moderate limitation in interacting with others due to the claimant's anxious and depressed mood and some difficulty being around others and in crowds. Accordingly, the undersigned finds the record does not establish limitations that would preclude work activity within the residual functional capacity defined in this decision.

(Tr. 23-24.)

The Court finds substantial evidence supports the ALJ's assessment of Rivera's subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Rivera's allegations of disabling conditions. (*Id.* at 21-26.) Contrary to Rivera's allegations, the ALJ credited some of Rivera's subjective symptoms but did not accept them to the extent alleged by Rivera because of findings on examinations, limited mental health treatment, including no treatment after May 2018, improvement with medication, no inpatient hospitalizations or repeated emergency room visits, and her daily activities, all factors to be considered under the regulations. (*Id.*) Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability. (*Id.*)

With respect to Rivera's ability to communicate in English, while "the ability to communicate in English is relevant to the ALJ's education determination," a claimant's "ability to communicate in English is not dispositive to the determination of disability." *Rivera v. Comm'r of Soc. Sec.*, Case No. 3:13 cv

772, 2014 WL 4956224, at *13 (N.D. Ohio Sept. 30, 2014) (internal citations omitted).[11]  The ALJ

identified a November 2017 examination where Rivera knew some English and was able to communicate

with the examiner.  (*Id.* at 23.)  Rivera testified at the hearing that she understood English and while she

spoke a little English, she did not like to speak it much.  (*Id.* at 52.)  While Rivera points to contrary

evidence, such as being accompanied by a case worker to her medical appointments (Doc. No. 20 at 2)

and testifying at the hearing with a Spanish interpreter (Doc. No. 18 at 18), as indicated above, it is not for

the Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."

*Garner*, 745 F.2d at 387.  Even if substantial evidence supports Rivera's position, the Court may not

overturn the ALJ's decision if substantial evidence also supports the ALJ's determination.  *See Buxton*,

246 F.3d at 772-3; *Her*, 203 F.3d at 389-90.  Furthermore, use of an interpreter does not undercut the

conclusion that Rivera could communicate in English.  *Medina v. Berryhill*, Case No. 1:16CV02524, 2017

WL 3601917, at *6, (N.D. Ohio Aug. 22, 2017).  While Rivera "disagrees with the ALJ's analysis of the

evidence relevant to [her] ability to communicate in English, [Rivera] has not shown that the ALJ's

determination is not supported by substantial evidence."  *Figueroa v. Comm'r of Soc. Sec.*, Case No. 1:19-

cv-02538, 2020 WL 6044364, at *14 (N.D. Ohio Oct. 13, 2020).

The ALJ referenced Rivera's allegations and then contrasted them with the medical evidence,

including examination findings, as well as the opinion evidence.  (Tr. 21-26.)  Reading the decision as a

whole, it is clear why the ALJ did not accept the entirety of Rivera's allegations.  *See* SSR 16-3p, 2016

WL 1119029 (the ALJ's "decision must contain specific reasons for the weight given to the individual's

symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the

adjudicator evaluated the individual's symptoms.").  The Court is able to trace the path of the ALJ's

reasoning regarding the ALJ's subjective symptom analysis.

---

[11] Effective April 27, 2020, 20 C.F.R. 416.964 no longer contains subpart (b)(5) regarding a claimant's inability to communicate in English.

Therefore, the undersigned recommends the Court find there is no error in the ALJ's subjective symptom analysis.

**C.     Third Assignment of Error**

In her third assignment of error, Rivera argues that the ALJ erred in failing to meet his burden at Step Five by: (1) failing to consider the effects of her pain, as well as her psychological limitations, on her ability to concentrate, focus, and complete tasks; (2) failing to indicate Rivera had trouble communicating in English and needed a translator; and (3) failing to include the VE's testimony about time off task and a person limited to occasionally handling and fingering with their dominant upper extremity.  (Doc. No. 18 at 21.)

The Commissioner responds that substantial evidence supports the ALJ's Step Five determination. (Doc. No. 19 at 12.)

"When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step inquiry."  *Johnson v. Comm'r*, 652 F.3d 646, 651 (6th Cir. 2011) (citing 20 C.F.R. § 404.1520).  While the claimant bears the burden of proof at Steps One through Four, the burden shifts to the Commissioner at Step Five.  *Id.* (citing *Wilson v. Comm'r*, 378 F.3d 541, 548 (6th Cir. 2004)).  At the fifth step in the analysis, "the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's [RFC] and vocational profile."  *Id.* (citing *Wilson*, 378 F.3d at 548).

It is clear Rivera's first two Step Five arguments are tied to her RFC and subjective symptom analysis arguments above.  As the undersigned explained *supra*, there is no error in the ALJ's RFC or subjective symptom analysis.

With respect to the VE's testimony in response to questions regarding time off task and limitations to occasional handling and fingering with the dominant upper extremity, the VE's testimony that no jobs

34

existed with the additional limitation that the individual would be off task 25% of the time or with occasional handling and fingering with the dominant upper extremity is not relevant to Rivera because the ALJ did not adopt and incorporate those limitations into the RFC.  The ALJ was not required to incorporate those limitations into the RFC, nor was the ALJ "required to base his conclusions on any VE testimony that responded to such a hypothetical limitation."  *Parham v. Comm'r of Soc. Sec.*, Case No. 1:19-cv-2236, 2020 WL 8771343, at *15 (N.D. Ohio Aug. 28, 2020) (citing *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013)), *report and recommendation adopted by* 2021 WL 408998 (N.D. Ohio Feb. 5, 2021).

While Rivera argues the ALJ's failure to include such limitations was harmful error in this case, with respect to Rivera's mental limitations, as explained above, substantial evidence supports the limitations assessed by the ALJ.  With respect to Rivera's ability to use her hands, Rivera makes no argument regarding substantial evidence, or the lack thereof, with respect to the ALJ's findings regarding handling and fingering with the dominant hand (Doc. No. 18),[12] and the Court will not make such arguments for her.

Therefore, the undersigned recommends the Court find no error at Step Five.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

---

[12] The closest Rivera comes to such an argument is making passing references in her brief to her testimony regarding numbness in her hands, that her cooking and carrying were limited by the limitations in her hands, legs, and knees, and weakness in her right arm.  (Doc. No. 18 at 5, 13, 19.)  The Court finds this insufficient to develop an argument that the ALJ's findings regarding Rivera's ability to handle and finger lacked substantial evidence. Therefore, the Court finds any such argument waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.'") (citations omitted).   Furthermore, as explained above, substantial evidence supports the ALJ's credibility assessment.

Date: October 4, 2021                         *s/ Jonathan Greenberg*
                                              Jonathan D. Greenberg
                                              United States Magistrate Judge


## OBJECTIONS

     **Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**